FILED
KENTON CIRCUIT/DISTRICT COURT

JAN 2 9 2014

JOHN C. MIDDLETON
BY _____ D.C.

COMMONWEALTH OF KENTUCKY
KENTON COUNTY CIRCUIT COURT
DIVISION IV
CIVIL ACTION NO. 13-CI-2609

| | | |
|---|---|---|
| HUE ENTERPRISES, INC., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | **DEFENDANT'S MEMORANDUM IN** |
| | : | **OPPOSITION TO MOTION FOR** |
| vs. | : | **TEMPORARY INJUNCTION** |
| | : | |
| G. GORDON HUE, JR., | : | |
| | : | |
| Defendant. | : | |

This is an action to recover an undetermined amount of Kentucky bourbon the Plaintiffs

claim belongs to them. Before the Court is what Plaintiffs call a "Motion for a Temporary

Injunction," by which they seek entry now – before discovery, evidence, and trial – of the final

judgment they ask for in the case, recovery of the bourbon. They do so without demonstrating

any need for temporary relief or the inadequacy of money damages, and they do so in the face of

$180,000 that they owe to the Defendant ("Gordon Hue"). Most importantly, they ignore the

fact that the spirits they seek to have turned over to them have never been included in their

inventory for one very simple reason – the product has never been their property.

### FACTS

This case is ultimately about the decline and fall of a northern Kentucky landmark, the

wine and spirits retailer Cork 'n Bottle.[1]  Cork 'n Bottle has a long and proud history of

---

[1] Ownership of Cork 'n Bottle is in two Kentucky corporations, Cork 'n Bottle, Inc., fka I-75
Liquors and Wines, Inc., which has been around as long as the store has been on Crescent
Avenue in Covington, and Hue Enterprises, Inc., a corporation formed in 2004. Mr. Hue, in this
brief, will treat them as the one entity that they are – and refer to it as the "Company" or "Cork
'n Bottle."

successful operations in northern Kentucky. It was founded by the father of Defendant Gordon Hue. Mr. Hue is also the older brother of Timothy Hue, current president of the Plaintiff corporations. Cork 'n Bottle remains a closely-held Kentucky corporation owned by Gordon Hue, Timothy Hue, and two of their sisters. It has fallen on very hard times.

Gordon Hue is a 27% owner of Plaintiffs. Hue affidavit, ¶7 ("Hue").[2] He has held an ownership position in the companies since his 1980 purchase of 12 shares of I-75 Liquors and Wines, Inc., the company now known as Cork 'n Bottle, Inc. He purchased the stock from his father, G. Gordon Hue ("Senior"), who continued to own the remaining 90 shares of the Company. Hue, ¶7. Between 1970 and 1995, Gordon Hue was responsible for the day-to-day operations of the Company. Senior passed away in 2004. In the last two years, prior to the summer of 2013, Gordon Hue was involved in advising and helping finance the operations of the Company. Hue, ¶9. Although still owed more than $180,000 for those efforts, he now finds himself the target of this unfounded lawsuit.

**The Bourbon Project.**

In the mid-1980's, Gordon Hue saw an opportunity to market and sell high-end Kentucky bourbon into a national and international market ("the Bourbon Project"). The concept that he developed was to find and acquire aged bourbon in the barrel, transport the bourbon to identified bottling facilities, bottle and label the bourbon, develop a distribution network, and then market and sell the product. Hue, ¶10.

At the time, I-75 Liquors and Wines, Inc. had a retail liquor license from the Commonwealth of Kentucky. Hue, ¶11. Counsel for the Company, Mr. John Brooking, advised that the Company could not purchase or own the bourbon for the Project under terms of its liquor

---

[2] Supporting this opposition are two affidavits – one of Gordon Hue, the other of Chris Otto, Operations Manager of Cork 'n Bottle from June of 2012 to August of 2013.

permit.  Accordingly, he insisted that Gordon Hue purchase and own the bourbon in his own name.  Hue, ¶12.

Based upon that advice, Gordon Hue proceeded with the project.  Gordon Hue located the barrels of bourbon, identified and contracted with those who would bottle and label the product, oversaw the transportation and bottling of the product, developed the distribution network – both within the United States and in Europe and Asia, and managed the entire operation.  Hue, ¶13. The first product identified was some 20 barrels of bourbon that were purchased, bottled and marketed starting in 1984.  The marketing of that product demonstrated that there were customers willing to pay for high end Kentucky bourbon in New York, California, Europe, and Asia.  When that effort demonstrated the viability of the Project, Gordon Hue went out and found 667 barrels, owned by Adolph and Buddy Hirsch.  Hue, ¶14.

In each instance, and consistent with the advice of Mr. Brooking, Gordon Hue entered into the contract for the bourbon in his own name, took title to the bourbon, his name was on the warehouse receipts for the barrels, and everyone participating in the project understood, including Senior and Mr. Brooking, that Gordon Hue owned the product.  A copy of the letter of understanding between Gordon Hue and Adolph and Buddy Hirsch for the 667 barrels of bourbon whiskey is attached as Exhibit 1 to Mr. Hue's affidavit.  A copy of the purchase agreement between Gordon Hue and Adolph and Buddy Hirsch is attached as Exhibit 2 to that affidavit:

> SALES AGREEMENT
>
> We, ADOLPH & BUDDY L. HIRSCH, hereby agree to sell our stock of "766 Barrels of Sour Mash Bourbon (OPG: 46,012.14)", stored at the Michter Distillery in Schaefferstown, Pennsylvania, to G. Gordon Hue, at a gross price of $125,000.00, in accordance with the provisions of this Agreement.

While not all of the costs for the product were paid for by Gordon Hue, the proceeds from the sales – the great bulk of which were to customers outside the northern Kentucky market area that the Company's retail operations served – came back to the Company, and, in the first year, were many times higher than costs the Company incurred. Hue, ¶17. In addition, there were sales of the product to the Company's customers in Covington and those proceeds went to the Company as well. Hue, ¶17.

The product was never included in the inventory of the Company. Hue, ¶18; Otto, ¶5. While it was stored in the basement, it was segregated and understood not to be something that was to be sold in the normal course of the business. Hue, ¶18; Otto, ¶4. The Company regularly kept in its basement wines and spirits that belonged to others – including the Company's customers. Hue, ¶18.

In 1995, Gordon Hue left the employ of Cork 'n Bottle. At the time, there remained some product from the Bourbon Project, and Mr. Brooking asked Gordon Hue to transfer his ownership rights in the remaining product to Cork 'n Bottle. Mr. Hue refused to do so. Hue, ¶19.

### Mr. Hue's Material Assistance to Cork 'n Bottle.

About two years ago, Mr. Timothy Hue, president of Plaintiffs and in charge of day-to-day operations, asked his brother Gordon to help the business get back on its feet after a number of financial setbacks. Gordon agreed and proceeded to provide advice and counsel. Hue, ¶20. As the finances of Cork 'n Bottle continued to deteriorate, Gordon stepped up and provided material financial assistance and assistance in getting product for the Company. Hue, ¶¶21-22.

That assistance ranged from cash infusions – some, but not all of which were repaid – to provision of product to Cork 'n Bottle – product that Cork 'n Bottle did not have the cash flow or credit to obtain itself. It included as well the costs of hardware and software necessary for

installation of a point-of-sale system in the Cork 'n Bottle stores. Again, Cork 'n Bottle did not have the cash flow or credit to purchase that system. All of that assistance was provided by Gordon Hue in the hopes that it would help put Cork 'n Bottle back on its feet. It was also provided with the agreement of Plaintiffs that it would be repaid. As of today, Plaintiffs owe to Mr. Hue more than $180,000. Hue, ¶24. Those claims, assuming they are not paid by the time an answer is filed, will be asserted as counterclaims and set-offs.

At the time that Gordon Hue was providing that assistance, the Company was being run by a four-person Board of Directors consisting of Mr. Timothy Hue, his brother Mr. Barry Hue, and two of their sisters, Nadine Hellings and Stefanie Hacker. Hue, ¶25. At the Board's insistence, cost controls were put into place in the Company, including controls on what Company assets Mr. Timothy Hue would have access to for his personal benefit. Hue, ¶29. That latter was an issue that had been endemic to Timothy Hue's management of the company.[3]

There remained, at that time, a small portion of the product from the Bourbon Project. It was in the basement along with Cork 'n Bottle inventory and wines and spirits that belonged to various others – including customers of Cork 'n Bottle. Hue, ¶26; Otto, ¶4. What remained of the Bourbon Project had a sign on it that it was not to be touched, under any circumstances. Notwithstanding the sign, bottles of the product continued to disappear. Otto, ¶¶2, 4. It was at that point, in March of 2013, that Gordon Hue took possession, for safekeeping, what remained from the Bourbon Project – the bourbon that he had purchased 25 years before. Hue, ¶27.

---

[3] Gordon Hue expects that, with the filing of the answer next month, there will not only be counterclaims offered on his own behalf for repayment of the material assistance he provided to the Company, but also claims on behalf of the shareholders, both individually and derivatively, against Mr. Timothy Hue for breach of fiduciary duty, theft of corporate assets, and the imposition of a constructive trust on corporate assets still in his hands – including his brother Barry's shares of stock in the Company.

**The Empire Strikes Back.**

In the summer of 2013, Timothy Hue apparently had enough of the Board's oversight of his management of the business. He reached out to his brother Barry, offered him a sum of money believed to be $50,000, and purchased Barry's 10.5% interest in the Company. Hue, ¶28. With that, Timothy Hue owned 54.9% of the Company, called a special meeting of shareholders for the purpose of throwing out his brother and sisters as directors, and installed his own slate of directors – friends of his, Thomas Neyer, George Vincent, and James Poston. Hue, ¶29.

The repayment to Gordon Hue of what he had put into the Company to keep it alive stopped. And this baseless lawsuit was filed.

## LAW AND ARGUMENT

There is little dispute on the law here. And no dispute on most of the fact issues, all of which point to denial of the Plaintiffs' motion. No one suggests, for example, that Gordon Hue is not a perfect custodian for the spirits here in question during the pendency of this litigation. There is some dispute on the subject of who owns the product that is subject of this lawsuit. Plaintiffs offer up circumstantial evidence that they might have an ownership interest. Against that are the words from Plaintiffs' President's mouth that the product belonged to his father and the Purchase Agreement showing that Defendant Gordon Hue is the owner.

### 1.    The product does not belong to Plaintiffs.

For its position that there is a likelihood of success on the merits, Plaintiffs offer a variety of circumstantial evidence – checks and advertising circulars – all from the time period when Gordon Hue was running Cork 'n Bottle. Plaintiffs offer no evidence that the product that they are seeking is now or ever has been included in the inventory of the Company. And with good reason. It never was. Cork 'n Bottle never included in its inventory any of this product. Hue,

¶18; Otto, ¶5. That was because the product has never, since the outset, belonged to Gordon Hue.

Attached to Gordon Hue's affidavit in opposition to the motion is the original purchase agreement on the 667 barrel purchase of Hirsch bourbon – a contract entered into between Gordon Hue and Adolph and Buddy Hirsch. It was improper, according to Plaintiff's counsel at the time, John Brooking, for the bourbon to be purchased by the Company, and he insisted that Gordon Hue take ownership of the product. Hue, ¶¶12, 15. When Gordon left the Company in 1995, it was Mr. Brooking who asked that he assign the then-remaining bourbon to the Company. Gordon refused. Hue, ¶19.

Even Plaintiffs' President, Mr. Timothy Hue, acknowledged that the Company did not own the products telling Chris Otto, at the time Operations Manager for the store, that it belonged to his father. Otto, ¶3.

There simply can be no showing of likelihood of success on the merits here.

### 2.      There is no evidence that there is any threat to the product – real or imagined.

Gordon Hue has possession of the product, and has had possession of the product since the March of 2013. Gordon Hue has spent his entire life in the business of storing high-end wines and spirits. He knows how to do it. Indeed, three of the four current directors of plaintiffs have entrusted to Mr. Hue storage of very high-end wines – over extended periods of time – in the recent past.

For example, Mr. Thomas Neyer is one of the new directors of Plaintiffs appointed to the Board last summer when Mr. Timothy Hue took control of the business and threw out the former directors, his sisters. In the summer of 2011, Mr. Neyer arrived at Gordon Hue's business, along with Mr. Timothy Hue and 75 to 90 cases of very expensive wines Mr. Neyer owned. They

asked that the wines be stored by Mr. Hue. They remained with Gordon for almost two years until Mr. Neyer retrieved them. Hue, ¶23.

After Mr. Neyer had entrusted his valuable wine collection to Mr. Hue's care, Mr. James Poston, another new director of Plaintiffs as of last summer, brought more than 50 cases of high-end wines that he owned to Mr. Hue to be stored for 7 or 8 months. Hue, ¶23. Gordon Hue knows what he is doing when it comes to the storage of high-end wine and spirits, and Plaintiffs' directors and agents, by their conduct, have consistently recognized that fact.

Of Plaintiffs' stated concerns in their motion, all that remains is that the bourbon might be drunk or sold. Mr. Hue offered to the Plaintiffs to commit not to sell or use the product pending the outcome of this litigation. That should be the end of this inquiry. But Plaintiffs declined that offer.

### 3.   There is no evidence of a need for urgency here.

While the product has been in Mr. Hue's possession since March of 2013, Plaintiffs waited 9 months before filing this lawsuit. *Marcum v. Wallace*, 56 S.W.2d 5, 246 Ky. 726 (Ky.App. 1932) ("One of the fundamental rules of equity is that equity aids the vigilant, not those who sleep upon their rights"). Plainly their actions evidence no sense of urgency. That fact is consistent with the reality that the Plaintiffs understand that Mr. Hue is not in this for personal gain and that he is very good and capable at storing this product.

### 4.   An injunction is designed to preserve the *status quo* – pending the outcome of a case.

It is black letter law in Kentucky that injunctions are designed to preserve the *status quo* pending the final determination of the case. *Cyprus Mountain Coal Corp. v. Brewer*, 828 S.W.2d 642 (Ky. 1992) (injunction vacated on appeal where "compliance with the temporary injunction will force a breach in its contract with Perry Transport and therefore change the status

quo of the parties involved"); *North Fork Collieries, LLC v. Hall*, 322 S.W.3d 98 (Ky. 2010) ("a typical request for a temporary injunction seeks to preserve the status quo pending a decision on the merits of some controversy, and thus raises questions about the movant's likely success on the merits and the risk of irreparable harm should the injunction be denied"); *Rogers v. Lexington-Fayette Urban County Government*, 175 S.W.3d 569 (Ky. 2005) (Plaintiffs' motion at 4) ("whether the injunction will merely preserve the status quo").

The *status quo* here is that the product be and remain in the possession of Mr. Hue. Plaintiffs here request not preservation of the *status quo*, but the final relief they seek in their lawsuit – return of the bourbon. *Oscar Ewing, Inc. v. Melton*, 309 S.W.2d 760 (Ky. 1958) ("It is apparent that the issuance of such an injunction constitutes a prejudgment of the controversy before the defendant has had his day in court, and doubtful cases should await final judgment. This is particularly true when mandatory relief is asked, as in the present case, which will change the status quo. Such relief, even on final hearing, will not be granted except in case of extreme necessity"); *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152 (Ky. 2009) ("it is important to remember that '[a] motion for a temporary injunction does not call for, or justify, an adjudication of the ultimate rights of the parties'"). There is and can be no showing of "extreme necessity."

Charles Cowdery is a writer who has regularly been published on subjects concerning American whiskey and, in particular, Kentucky bourbon. A member of the Kentucky Bourbon Hall of Fame, Mr. Cowdery is the author of *Bourbon, Straight: The Uncut and Unfiltered Story of American Whiskey.* Several years ago Mr. Cowdery undertook research on the Hirsch bourbon. He interviewed the participants in the sale and bottling of the product, he reviewed their records, and he wrote about the transaction as follows:

Fifteen years later, when the end came for Michter's [distillery in Newmanstown, Pennsylvania] and Hirsch finally had to find a customer for his whiskey, lest he lose it in the chaos that was sure to follow, he found Gordon Hue, who with his father and brothers ran a large liquor store in Covington, Kentucky, called the Cork and Bottle.

As a sideline to his retail operation, Gordon Hue had been bottling extra aged whiskey and selling it for high prices in Japan and other international markets since about 1984. What the Japanese wanted was American whiskey aged for durations similar to those of scotch whiskey....

Hue bought Hirsch's 400 barrels and got it out of Pennsylvania before the final ownership group abandoned the place.

Charles Cowdery, <em>The Best Bourbon You'll Never Taste</em> (2012).

We expect that, after discovery at trial, this Court will reach the same conclusion as to who owns this bourbon.

Because Plaintiffs cannot demonstrate likelihood of success on the merits or irreparable harm, and because they cannot demonstrate any harm at all likely to happen between now and the conclusion of this lawsuit, they cannot establish the requirements for an injunction pending litigation under Kentucky law. The Court should deny their motion.

Respectfully submitted,

_____

Mark T. Hayden
James M. Dickerson, Jr. (*pro hac* application pending)
W. Stuart Dornette (*pro hac* application pending)
Taft Stettinius & Hollister LLP
1717 Dixie Highway, Suite 910
Covington, KY 41011
Telephone: 513.381.2838
Fax: 513.381.0205
mhayden@taftlaw.com
jdickerson@taftlaw.com
dornette@taftlaw.com

*Attorneys for Defendant/Counterclaim*
*Plaintiff G. Gordon Hue, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Opposition to Motion for

Temporary Injunction was served upon Thomas C. Smith, Steven C. Martin, and Daniel A. Hunt,

Ziegler & Schneider, P.S.C., 541 Buttermilk Pike, Suite 500, P.O. Box 175710, Covington,

Kentucky 41017, this 29th day of January, 2014.

Mark T. Hayden

COMMONWEALTH OF KENTUCKY
KENTON COUNTY CIRCUIT COURT
DIVISION IV
CIVIL ACTION NO. 13-CI-2609

HUE ENTERPRISES, INC., *et al.*,     :

        Plaintiffs,          :

                       :       **AFFIDAVIT OF CHRIS OTTO**

vs.                    :      **IN OPPOSITION TO MOTION FOR**

                       :       **TEMPORARY INJUNCTION**

G. GORDON HUE,           :

                       :

        Defendant.         :

STATE OF OHIO          )
                          )    SS:
COUNTY OF HAMILTON   )

      CHRIS OTTO, being first duly cautioned and sworn, deposes and says as follows:

      1.      I am a resident of the State of Ohio. I currently work as a manager for Pot Belly. From June of 2012 through August of 2013, I was operations manager at Cork 'n Bottle.

      2.      Sometime in late 2012 or early 2013, when I was in the cash room in the basement of Cork 'n Bottle's Covington store, I came across 3 bottles of a very high end aged bourbon that were hidden in different places in the room. I asked Mr. Timothy Hue about the bottles and was told that he did not know how they had gotten there – that they could have been hidden away by his father.

      3.      Mr. Timothy Hue also told me that the bourbon had belonged to his father. And was off limits to customers of the store.

4.      When Mr. Gordon Hue came to the store, I asked him about the bottles and he took me to a back room in the basement where there were several boxes of bourbon.  He had initialed and had counts on the boxes from October of 2012.  When we looked at a box that matched the labels on the three bottles, we found that there were three fewer bottles in the box than the October 2012 count had indicated.  At that point Mr. Gordon Hue said he wanted the bourbon out of the store so that more of it would not disappear.

5.      At no time during my tenure with Cork 'n Bottle was any of the high end bourbon included in the boxes in the basement back room part of the inventory of Cork 'n Bottle.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Chris Otto


Sworn to and subscribed before me, a Notary Public, in the State of Ohio, this 29th day of January, 2014.

_____
Notary Public

STUART DORNETTE, Notary
Notary Public, State of Ohio
My Commission has no expiration date
Section 147.03 R. C.

2

COMMONWEALTH OF KENTUCKY
KENTON COUNTY CIRCUIT COURT
DIVISION IV
CIVIL ACTION NO. 13-CI-2609

HUE ENTERPRISES, INC., *et al*.,                    :
                                                    :
    Plaintiffs,                   :
                                                    :
vs.                                                 :   **AFFIDAVIT OF G. GORDON HUE**
                                                    :   **IN OPPOSITION TO MOTION FOR**
                                                    :   **TEMPORARY INJUNCTION**
G. GORDON HUE,                                      :
                                                    :
    Defendant.                    :


STATE OF OHIO         )
                    )   SS:
COUNTY OF HAMILTON  )

      G. GORDON HUE, being first duly cautioned and sworn, deposes and says as follows:

      1.     I am a resident of the State of Ohio.  I currently own and operate a wine import and distribution business with its headquarters in Ohio under the name of wineCRAFT.  We sell wines to accounts in Ohio and to wholesale distributors outside the State of Ohio.  Some of our customers include Via Vite, Sotto, Nada, Boca, and Nicola's.

      2.     I have been in the wine and spirits business for my entire career.  I started in high school working at I-75 Liquors, subsequently known as Cork 'n Bottle.

      3.     For 25 years, I was responsible for the day-to-day operations of Cork 'n Bottle.

      4.     I left Cork 'n Bottle in 1995 to start the wine distribution business at Dennert Distributing, and I ran that for a number of years until I started wineCRAFT.

5.      In every one of those positions, I have been responsible, among other things, for warehousing and storing fine wines and spirits. I understand the requirements and responsibilities for such storage.

6.      Cork 'n Bottle was founded by my father. Mr. Timothy Hue, current president of the Plaintiff corporations (the "Company") is my brother. Cork 'n Bottle remains a closely-held Kentucky corporation owned by Timothy Hue, two of our sisters, and me.

7.      I have had an ownership position in Cork 'n Bottle since my 1980 purchase of 12 shares of I-75 Liquors and Wines, Inc., the company now known as Cork 'n Bottle, Inc. I purchased that stock from my father who continued to own the remaining 90 shares of the Company. My father passed away in 2004. As of last summer, I owned 27% of the Company.

8.      Between 1970 and 1995, I was responsible for the day-to-day operations of the Company.

9.      In the last two years, prior to the summer of 2013, I have been involved in advising and helping finance the operations of the Company.

**The Bourbon Project**.

10.     In the mid-1980's, I saw an opportunity to market and sell high-end Kentucky bourbon into a national and international market ("the Bourbon Project"). The concept that I developed was to find and acquire aged bourbon in the barrel, transport the bourbon to identified bottling facilities, bottle and label the bourbon, develop a distribution network, and then market and sell the product.

11.     At the time, I-75 Liquors and Wines, Inc. had a retail liquor license from the Commonwealth of Kentucky.

2

12. Counsel for the Company, Mr. John Brooking, advised that the Company could not purchase or own the bourbon for the Project under terms of its liquor permit. Accordingly, he insisted that I purchase and own the bourbon in my name.

13. I located the barrels of bourbon, identified and contracted with those who would bottle and label the product, oversaw the transportation and bottling of the product, developed the distribution network – both within the United States and in Europe and Asia, and managed the entire operation.

14. The first product identified was some 20 barrels of bourbon that were purchased, bottled and marketed starting in 1984. The marketing of that product demonstrated that there were customers willing to pay for high end Kentucky bourbon in New York, California, Europe, and Asia. When that effort demonstrated the viability of the Project, I went out and found 667 barrels, owned by Adolph and Buddy Hirsch.

15. In each instance, and consistent with the advice of Mr. Brooking, I entered into the contract for the bourbon in my own name, took title to the bourbon, and everyone participating in the project understood, including my father and Mr. Brooking, that I owned the product.

16. A copy of the letter of understanding between me and Adolph and Buddy Hirsch for the 667 barrels of bourbon whiskey is attached as Exhibit 1. A copy of the purchase agreement between me and Adolph and Buddy Hirsch is attached as Exhibit 2. I signed the Purchase Agreement and returned it to the Hirsches.

17. While not all of the costs for the product were paid for by me, the proceeds from the sales – the great bulk of which were made outside the northern Kentucky market area that the

3

Company's retail operations served – came back to the Company, and, in the first year, were many times higher than the entire costs the Company incurred. In addition, there were sales of the product to the Company's customers in Covington and those proceeds went to the Company as well.

18.     The product was never included in the inventory of the Company. While it was stored in the basement, it was segregated and understood not to be something that was to be sold in the normal course of the business. The Company regularly kept in its basement wines and spirits that belonged to others – including the Company's customers.

19.     In 1995, I left the employ of Cork 'n Bottle. At the time, there remained some product from the Bourbon Project, and Mr. Brooking asked me to transfer my ownership rights in the remaining product to Cork 'n Bottle. I refused to do so.

**Material Assistance to Cork 'n Bottle.**

20.     About two years ago, my brother Tim, president of Plaintiffs and in charge of day-to-day operations, asked me to help the business get back on its feet after a number of financial setbacks. I agreed and proceeded to provide advice and counsel.

21.     As the finances of Cork 'n Bottle continued to deteriorate, I stepped up and provided, with our mother, material financial assistance and assistance in getting product for the Company.

22.     My assistance ranged from cash infusions – some, but not all of which were repaid – to provision of product to Cork 'n Bottle – product that Cork 'n Bottle did not have the cash flow or credit to obtain itself. It included as well the costs of hardware and software

4

necessary for installation of a point-of-sale system in the Cork 'n Bottle stores. Again, Cork 'n Bottle did not have the cash flow or credit to purchase that system.

23.     I also provided storage of high end wines for customers of Cork 'n Bottle whom my brother Tim brought to me. In the summer of 2011, Mr. Thomas Neyer arrived at my business, along with Tim and 75 to 90 cases of very expensive wines Mr. Neyer owned. They asked that I store the wines for Mr. Neyer; the wines remained with me for almost two years until Mr. Neyer retrieved them. Mr. Neyer subsequently became one of the new directors of Cork 'n Bottle in the summer of 2013 after Tim threw his brother and two sisters off the Company's board of directors. Some time after Mr. Neyer had entrusted his valuable wine collection to my care, Mr. James Poston, brought more than 50 cases of high-end wines that he owned to Mr. Hue to be stored for 7 or 8 months. Mr. Poston is another of the new directors added to the Cork 'n Bottle board last summer after Tim took control.

24.     All of assistance that I provided to Cork 'n Bottle over the last several years I have done in the hopes that it would help put Cork 'n Bottle back on its feet. It was also provided with the agreement of Plaintiffs that it would be repaid. As of today, Plaintiffs owe to me more than $182,000 for repayment of those amounts and product advanced.

25.     At the time that I was providing that assistance, the Company was being run by a four-person Board of Directors consisting of my brothers Tim and Barry and my sisters Nadine Hellings and Stefanie Hacker. At the Board's insistence, cost controls were put into place in the Company, including controls on what Company assets Tim would have access to for his personal benefit – something that we had seen my brother Tim do many times in his management of the Company.

5

14024250.1

26.     There remained, at that time, a small portion of the product from the Bourbon Project.  It was in the basement along with Cork 'n Bottle inventory and wines and spirits that belonged to various others – including customers of Cork 'n Bottle.  What remained of the Bourbon Project had a sign on it that it was not to be touched, under any circumstances.

27.     Notwithstanding the sign, bottles of the product continued to disappear.  In March, 2013, when I visited and learned that more of the product had disappeared, I took what remained from the Bourbon Project and put it into safekeeping, where it remains today.

28.     By the summer of 2013, my brother apparently had enough of the Board's oversight of his management of the business.  He reached out to our brother Barry, offered him a sum of money I understood to have been $50,000, and purchased Barry's 10.5% interest in the Company.

29.     With that, Timothy Hue owned 54.9% of the Company, called a special meeting of shareholders for the purpose of throwing out his sisters and brother as directors, and installed his own slate of directors – friends of his, Thomas Neyer, George Vincent, and James Poston.

FURTHER AFFIANT SAYETH NAUGHT.

_____
G. Gordon Hue


Sworn to and subscribed before me, a Notary Public, in the State of Ohio, this 28th day of January, 2014.

_____
Notary Public

WILLIAM STUART DORNETTE, Attorney at Law
Notary Public, State of Ohio
My Commission has no expiration date
Section 147.03 R. C.

6

February 8, 1989

Letter of Understanding
to G. Gordon Hue, of Covington, Kentucky

In accordance with the discussion between myself, G. Gordon Hue
and Paul Buben this date, I have agreed to the following transaction
in connection with my warehouse receipts representing "766 Barrels,
Sour Mash Bourbon Whiskey (OPG: 46,012.14), stored at 'Michter's Dis-
tillery' in Schaefferstown, Pennsylvania".

Gordon Hue has agreed to purchase the above inventory for a cash sum
of $125,000.00, subject to a proportionate adjustment payable to Mr. Hue
in the event that the re-gauged quantity of the above inventory should
happen to be less than 28,000 gallons. Mr. Hue will have the opportunity
to confirm this quantity within one year from the transaction date, after
which time the purchase price (less any adjustment) would be final.

I will pay any storage charges due to the Michter Distillery on this
inventory through 2/28/89.

I further would agree to let Mr. Hue use my name in the labelling and
marketing of the product bottled from this inventory, if he so desires.


Adolph H. Hirsch for himself
and Buddy L. Hirsch, his wife
and joint owner of the inventory


Witness: G. Gordon Hue


Paul Buben

DEFENDANT'S
EXHIBIT
PENGAD-Bayonne, N. J.
NO. 1

### SALES AGREEMENT

We, ADOLPH & BUDDY L. HIRSCH, hereby agree to sell our stock of "766 Barrels of Sour Mash Bourbon (OPG: 46,012.14)", stored at the Michter Distillery in Schaefferstown, Pennsylvania, to G. Gordon Hue, at a gross price of $125,000.00, in accordance with the provisions of this Agreement.

Mr. Hue would agree hereby to pay a sum of $25,000.00 upon the acceptance of this Agreement, and, to execute an Instalment Note for $100,000.00, requiring payments of $25,000.00 on "September 1, 1989", "December 1, 1989", "March 1, 1990", and, "June 1, 1990". This would be an "interest free" loan if paid per schedule.

Upon such acceptance and payment, we will transfer the Warehouse Receipts to Mr. Hue, giving him full possession of the stock at Michter's Distillery site.

Mr. & Mrs. Hirsch will honor the further provision stated in Mr. Hirsch's "Letter of Understanding" (dated 2/8/89), that the purchase price could be adjusted within one year in ratio of the the "actual re-gauged gallons" corresponding to the "expected minimum re-gauged gallon amount of 28,000 gallons". Also, Mr. Hirsch would continue to agree to let Mr. Hue use his name in the labelling and marketing of the product bottled from this stock, if Mr. Hue wishes to do so.

The enclosed Instalment Note anticipates that Mr. Hue would execute this Note jointly with his wife, or some other responsible party. Should Mr. Hue desire to execute the Note personally, we will accept a Note, correspondingly worded, with Mr. Hue as the sole 'maker'.

To accept this offer, Mr. Hue is requested to submit the initial $25,000.00 remittance, and, the executed Note, as of June 1, 1989.

If Mr. Hue is not interested in accepting this offer, effective June 1, 1989, this offer should be considered null and void.

If Mr. Hue wishes to accept this offer but has some short-range problem in complying with the June 1, 1989 date, we will consider any alternative arrangment that he may wish to re-offer, provided he contacts us on or before June 1, 1989, to discuss the alternative, and, that he is prepared to execute an Agreement that will be acceptable to all parties by June 8, 1989.

By: _____       Date:  May 26, 1989
      Adolph Hirsch

_____
Buddy L. Hirsch

Accepted by: _____       Date: _____
           G. Gordon Hue

Address : 



DEFENDANT'S EXHIBIT

NO. 2